Bryce BAGGETT, Petitioner,

v.

STATE ELECTION BOARD of the State of Oklahoma, Composed of Edna Mae Phelps et al., Respondents,

J. Ted Bonham, Intervenor.

No. 46043.

Supreme Court of Oklahoma.

Oct. 5, 1972.

Burck Bailey, John A. Claro, Oklahoma City, for petitioner.

James F. Fellingham, William C. Boston, Jr., David Hudson, Oklahoma City, for intervenor.

IRWIN, Justice:

104 illegal ballots were cast by unqualified electors in the Democratic runoff primary election held on September 19, 1972, for the selection of the Democratic nominee for the office of State Senator, State Senate District No. 41, Oklahoma County. The announced results of that election were that candidate J. Ted Bonham, received 3,466 votes and candidate Bryce Baggett, received 3,457 votes, or a majority of 9 votes in favor of Bonham. It is apparent unless it can be shown by competent evidence for which candidate the illegal ballots were cast, it cannot be determined with mathematical certainty which candidate received the majority of the legal votes cast by qualified electors.

Within the time prescribed by 26 O.S. 1971, § 391, Baggett filed with the State Election Board a petition contesting the election and made a cash deposit of $250.-00. A hearing was conducted by the State Election Board and competent evidence was introduced disclosing that 104 illegal ballots were cast by unqualified electors. However, the State Election Board denied Baggett's contest for the reason that "it had no jurisdiction to hear the contest petition because no recount was requested in the petition nor was fraud alleged in the conduct of the election as provided by 26 O.S. 1971, § 391." The State Election Board ordered that Bonham be certified as the Democratic nominee for the office of State Senator, State Senate District No. 41.

In this original proceeding Baggett seeks a Writ of Mandamus directed to the State Election Board compelling and requiring that Board to perform its statutory duties and to grant him the relief that the law requires.

J. T. Bonham was permitted to intervene in this original proceeding.

On September 29, 1972, this Court issued an Order wherein it assumed Original Jurisdiction and issued a Writ of Mandamus as therein explained. In that Order the State Election Board was enjoined from issuing to either Baggett or Bonham a Certificate of Nomination as the 1972 Democratic nominee for State Senator, State Senate District No. 41, as a result of the September 19, 1972, Democratic runoff primary election. This Court also ordered the State Election Board to cause to be conducted, at such time as it shall be determined to be feasible, another Democratic runoff primary election for the selection of such 1972 Democratic nominee.

The fundamental issue presented in these proceedings is: "Where a Democratic runoff primary election has been conducted and one of the candidates files a protest challenging the announced results of the election, should the State Election Board issue a certificate of nomination to either candidate where:

"(1) the contest petition sufficiently alleges and describes in considerable detail specific illegal irregularities concerning the conduct of the election;

"(2) the contest petition alleges that 104 illegal ballots were cast by unqualified electors and on hearing before the State Election Board, contestant conclusively proves that such 104 illegal ballots were cast;

"(3) the 104 illegal ballots cast are sufficient to change the announced results of the election for the reason such results showed only 9 votes difference between the number of votes received by the candidates;

"(4) in one precinct a sufficient number of illegal ballots was cast to change the results of the election and in such precinct the election officials knowingly permitted non-registered Democrats to vote; and

"(5) it cannot be determined with mathematical certainty from the election returns which candidate received the majority of the legal votes cast by quali-

fied electors and no competent evidence is introduced showing for which candidate any of the 104 illegal ballots were cast."

■ One of the first issues to be determined is whether or not this Court has the constitutional power and authority to inquire into and determine the issues presented in these proceedings in view of 26 O.S.1971, § 391, which provides in part:

"No court shall have jurisdiction of or authority to issue any enjoinder, proceeding, mandamus or process to inquire into, review or control the action of any election board pertaining to primary elections, except as hereinabove provided; * * *."

In Sparks v. State Election Board, Okl., 392 P.2d 711 (1964), the identical issue was presented and in that case we held:

"Where in recount proceedings conducted by the State Election Board a pure and unmixed question of law is presented as to whether a qualified elector's vote should be counted and the answer to the question depends upon the construction of constitutional and statutory provisions, the State Election Board acts in a judicial capacity when performing this function, and the action taken by said Board is subject to the supervision of this court under the provisions of Art. 7, Sec. 2, Okl.Const."

Under the authority of Sparks and Article 7, § 4, Oklahoma Constitution as amended in 1967, we hold that this Court has the Constitutional power and authority to inquire into and determine the issues presented.

We will now consider whether Baggett's petition filed with the State Election Board, was sufficient to invoke the jurisdiction of the State Election Board. The State Election Board determined it did not because Baggett did not request a recount and did not allege fraud.

In his petition, Baggett alleged that 104 persons who were not registered as members of the Democratic party were permitted to vote and did vote in violation of 26 O.S.1971, § 93.18; and that each ballot cast by each one of those 104 persons constituted an irregular and illegal ballot and an election irregularity.

In support of his allegation that 104 persons who were not qualified to vote in the election but did vote, Baggett set forth each precinct in State Senate District No. 41, and the precincts in which illegal ballots were cast. There are 25 voting precincts in District 41. Baggett alleged in one named precinct 24 illegal ballots were cast and in another named precinct 16 illegal ballots were cast. In each of the named precincts where 24 and 16 illegal ballots were cast, Baggett alleged that the number of illegal ballots cast is more than the 9 vote margin in favor of Bonham; and that since those ballots were irregular and illegal, and impossible to distinguish from the legal ballots cast, the law requires that the votes in those precincts be set aside and excluded in the count of the ballots.

Baggett further alleged that the illegal ballots cast in each of the two named precincts above referred to were sufficient to change the outcome of the election and that the number of illegal ballots cast in the remaining precincts where illegal ballots were cast were not sufficient, as to any single precinct considered separably, to change the results of the election; and that as to these remaining precincts, the Election Board should include and count all the votes cast therein.

According to Baggett's petition and the proof adduced, in the 25 voting precincts which comprise State Senate District No. 41, there was only one other election being conducted that day and that involved another Democratic runoff primary election. Stated in another way, there was no election being conducted in State Senate District No. 41, on September 19, 1972, in which a person could legally vote unless that person was registered as a member of the Democratic party.

In the prayer of his petition, Baggett requested that the State Election Board issue to him a certificate of nomination

as the Democratic party nominee for the office of State Senator for State Senate District No. 41; or in the alternative, that the State Election Board decline and refuse to issue a certificate of nomination to either candidate.

Baggett's petition clearly discloses that he was not seeking a recount of the votes as tabulated and returned by the separate precincts, and it clearly discloses that he did not allege that fraud occurred in the election. The material allegations in Baggett's petition were predicated on the theory that illegal ballots had been cast by unqualified electors and such illegal ballots were sufficient in number to change the announced results; and that the illegal ballots cast by the unqualified electors were irregular and illegal and it was impossible to distinguish them from the legal ballots cast by qualified electors.

Baggett's petition, although not specifically containing the word "recount" must necessarily be construed to mean that he was requesting a recount of the legal ballots cast by qualified electors and that such recount should not include the illegal ballots cast by unqualified voters.

■ 26 O.S.1971, § 391, provides that all hearings before the State Election Board involving an election contest shall be public and that the chairman and secretary of the Board shall be authorized and empowered to issue subpoenas for all witnesses. It also provides that upon the filing of contests the Board shall assemble and proceed with the hearing or other disposition of the contest. Under the authority of Sparks, supra, the Board would be acting in a judicial capacity in determining whether a voter was or was not a qualified elector in an election in which a contest had been filed.

■ In our opinion, § 391, supra, should not be given the narrow construction that the State Election Board construed § 391 to have. If the State Election Board did not have jurisdiction to hear and determine the allegations of Baggett's petition, the Legislature has not provided a

forum. This is so because the contest of primary elections as set forth in § 391, is exclusive of all other remedies. See Wagoner County Election Board v. Plunkett, Okl., 305 P.2d 525.

■ We hold that Baggett's petition of contest was sufficient to invoke the jurisdiction of the State Election Board and it did have jurisdiction to hear and determine whether illegal ballots had been cast in the election by unqualified voters and dispose of the issues properly presented by the allegations in the petition and the competent evidence in support thereof.

This Court recognizes that 26 O.S.1971, § 256, provides a procedure for challenging the right of an elector to vote in an election before the elector has cast his ballot. None of the 104 illegal voters who cast their ballots in the instant election were challenged prior to the time they cast their ballot.

In the Sparks case, supra, we said:

"In State ex rel Edwards v. Millar, 21 Okl. 448, 96 P. 747, we quoted with approval from Hirsh v. Wood, 148 N.Y. 142, 143, 42 N.E. 536, 537, as follows:

"'We can conceive of no principle which permits the disfranchisement of innocent voters for the mistake or even the willful misconduct of election officers in performing the duty cast upon them. The object of elections is to ascertain the popular will, and not to thwart it. The object of election laws is to secure the rights of duly qualified electors, and not to defeat them. Statutory regulations are enacted to secure freedom of choice and to prevent fraud, and not by technical obstructions to make the right of voting insecure and difficult.'"

If the object of elections is. to obtain the popular will and not thwart it, and to secure the rights of duly qualified electors and not defeat them, may unqualified electors cast illegal ballots and dilute the effectiveness of a legal vote cast. We think not.

■ Baggett's petition of contest was filed within the time prescribed by § 391,

supra, and it contained specific allegations of election irregularities. In our opinion, § 256, supra, should not be construed to mean that unless unqualified electors are challenged as therein set forth, such unqualified electors acquire the status of qualified electors where certain precinct election officials knowingly permit, as will be hereinafter discussed, non-registered voters of the Democratic party to vote in a Democratic runoff primary election in a sufficient number to change the results of the election.

Bonham contends that the only evidence submitted by Baggett at the hearing before the State Election Board was that the Oklahoma County Election Board produced the precincts books and testified that 104 persons who were not registered as members of the Democratic party signed such poll books. In our opinion, the evidence submitted affirmatively and conclusively establishes that 104 illegal ballots were cast by unqualified electors. There is no evidence to the contrary.

Bonham contends that a showing that 104 illegal ballots had been cast was not sufficient but that the burden was upon Baggett to also prove for which candidate the illegal ballots were cast. Bonham in effect argues that the burden was upon Baggett to prove by competent evidence that a sufficient number of the illegal ballots were cast for Bonham to change the announced results of the election. To sustain this argument, Bonham cites Goar v. Brown (1921), 82 Okl. 227, 200 P. 156, wherein Goar brought an action in the Superior Court of Pottawatomie County to cancel an election certificate which had been issued by the county election board certifying that Brown had been elected to the office of county commissioners. In that case the court held:

"Where an election is held by duly appointed officers, the presumption is that the votes received and counted by them are legal, and the burden is on the party attacking the same to show their illegality.

"Where it is sought to review the validity of an election on the ground of illegal voting, those seeking to overcome the result as declared by the election officers have the burden of proving, not only that illegal votes were cast in sufficient number to change the result, but by whom and for whom, or for what issue or question submitted, such votes were cast."

In Goar, the election had become final and no contest proceedings had been filed with the election board. In Wickersham v. State Election Board, Okl., 357 P.2d 421, we said that in view of the fact that our contest statutes are an integral part of our election laws and that an election is not over or final until disposition is made of a proper protest timely filed, there is no substantial grounds for distinguishing the right to recount in a proper case from the right to a count of votes in the first instance. In Goar, the action was to cancel an election certificate that had been issued after the election had become final. In the instant proceeding, a certificate of nomination has not issued, the election is not final, and Baggett is seeking only to have the votes of only the qualified electors counted.

Bonham also cites Cobb v. Berry (1917), 67 Okl. 29, 168 P. 46, which involved an action filed in the district court to cancel an election certificate that had been issued by the county election board. In Cobb, as in the Goar case, the election had become final.

The other cases relied upon by Bonham to sustain his contention that the burden was upon Baggett to show that a sufficient number of the illegal ballots cast were cast for Bonham to overcome the 9 vote plurality as shown on the face of the returns, are: Ledbetter v. Kimsey (1913), 38 Okl. 671, 134 P. 868; Dunagan v. Town of Red Rock (1916), 58 Okl. 218, 158 P. 1170; Reid v. City of Muskogee (1929), 137 Okl. 44, 278 P. 339; Toohey v. Town of Canton (1936), 177 Okl. 426, 60 P.2d 729; Kimberlin v. Board of County Com'rs of

Garvin County (1920), 78 Okl. 143, 189 P. 361; Dominic v. Davis (1953), Okl., 262 P.2d 143; and Groves v. Board of County Com'rs, Washita County (1967), Okl., 429 P.2d 994.

Each of the above cases, except Dominic v. Davis, involved actions filed in the district court to enjoin the issuance of certain bonds and to declare the elections void. The Dominic case involved an action in the district court to set aside and vacate an order annexing one school district to another. None of the cases involved proceedings before an election board where the results or the validity of an election was still pending.

In the instant proceeding we are not concerned with an election that has become final and an action is brought in the district court challenging the legality of the election. Here, the election has not become final; a contest has been filed; and final disposition has not been made of that contest.

The 1970 Legislature enacted S.C.R. No. 86 (1970 Oklahoma Session Laws, page 695) declaring it to be the Legislative intent "that the statutes of this state which grant authority to a candidate in an election *to challenge the correctness of the results of an election,* including a recount of the ballots cast, only apply to elections wherein a vote is cast for candidates. Legislative authority has not been granted for a recount of votes cast in any election wherein a question or proposition is submitted for approval or rejection." (emphasis ours).

It appears the Legislature determined there is a distinction between an election of candidates to public office and a bond election. At least it has provided a vehicle for contesting an election involving candidates for public office, and has specified a period of time in which a contest may be filed. Our research does not indicate the Legislature has provided a similar vehicle for challenging the correctness of an election wherein a question or proposition is submitted to the voters for approval or rejection. It appears from S.C.R. No. 86, supra, that no statutory authority exists.

When Baggett filed his petition to contest the election, the election had not become final, and there were no substantial grounds for distinguishing Baggett's right to have only the legal ballots counted by the State Election Board then from his right to have only the legal ballots counted in the first instance. Wickersham v. State Election Board, Okl., 357 P.2d 421.

The election was conducted by the duly appointed precinct election officials. There is a presumption that they conducted the election according to law. However, Baggett proved that the election was not conducted according to law, that 104 illegal ballots were cast, and in one precinct a sufficient number of illegal votes was cast to change the results of the election and in such precinct the election officials knowingly permitted non-registered Democrats to vote. Since there was only a 9 vote margin in the announced results, Baggett conclusively proved that the State Election Board could not determine with mathematical certainty from the election returns which candidate received the majority of the legal ballots cast.

In Williamson v. State Election Board, Okl., 431 P.2d 352, we held that if the State Election Board cannot determine with mathematical certainty which candidate received the majority of the legal votes cast in an election, such Board is not required to issue a certificate of election.

Baggett alleged and proved that in one of the precincts 16 illegal ballots were cast by unqualified electors. The record discloses, without dispute, in that precinct election officials knew that persons who were not registered as Democrats were voting in the Democratic runoff primary election and they knowingly permitted such persons to vote. In fact, the precinct election judge, who was not registered as a member of the Democratic party, signed "the poll book as a voter". The inexcusable conduct of the election officials in that particular precinct has not been explained.

■ Inasmuch as an election of candidates for a public office does not become final until disposition is made of a contest if a contest is filed; and the State Election Board cannot determine with mathematical certainty which candidate received the majority of the legal votes cast because of the inexcusable conduct of certain precinct election officials; the burden should not be upon Baggett to prove for which candidate the unlawful ballots were cast to be relieved from having the illegal ballots counted as legal ballots. Neither Baggett nor Bonham were responsible for the unlawful ballots being cast and neither were responsible for the conduct of the election. If election officials have not conducted an election according to law and knowingly permit non-registered Democrats to vote in a Democratic runoff primary election, the inexcusable conduct of the election officials should not inure to the benefit of any candidate either directly or indirectly.

The circumstances in the case at bar are somewhat similar to those presented in the Williamson case, supra. In that case a voting machine failed to function properly and an undetermined number of votes were cast by qualified electors which were not recorded by the voting machine. The number of uncounted votes could have been sufficient to change the announced results of the election. The State Election Board refused to issue a certificate of election to Williamson who had received the majority of the recorded votes.

Williamson filed an original action in this Court seeking a Writ of Mandamus directing the State Election Board to issue to him a certificate of election. We declined to issue the writ on the grounds that the State Election Board could not determine with mathematical certainty which candidate received the majority of the *legal* votes cast.

In Williamson, the election officials knew the voting machine was not functioning properly before the polls were closed and that the candidates may not have been receiving all the votes they were entitled to

receive. In the case at bar, certain precinct election officials knowingly permitted non-registered Democrats to vote in a Democratic runoff primary election.

If neither candidate in the Williamson case was entitled to a certificate of election because the voting machine failed to properly record all the votes cast, neither candidate is entitled to a certificate of nomination in the instant proceeding because certain precinct election officials failed to "function properly" and illegal ballots cast by unqualified electors were recorded.

In both instances, the State Election Board could not determine with mathematical certainty which candidate received the majority of the legal ballots cast.

■ The fact that a contestant proves that illegal ballots have been cast and the number of illegal ballots cast is sufficient to change the results of the election does not necessarily mean that the election should be declared void. If competent evidence can be introduced establishing that in spite of the illegal ballots cast, it may be determined with mathematical certainty which candidate received the majority of the legal votes cast, the State Election Board should issue its certificate of election.

■ No competent evidence was introduced tending to establish for whom the illegal ballots were cast. Absent such evidence, the State Election Board could not determine with mathematical certainty which candidate received the majority of the legal votes cast. Therefore, neither Baggett nor Bonham is entitled to a certificate of nomination as the Democratic nominee for State Senator, State Senate District No. 41, as a result of the September 19, 1972, election.

It should be noted that we had presented for our determination in these proceedings an election contest wherein certain precinct election officials knowingly permitted non-registered Democrats to vote in a Democratic runoff primary election in sufficient numbers so that it became impossible to determine with mathematical certainty which

candidate received the majority of the legal votes cast. Therefore, this proceeding did not involve an election contest where non-registered Democrats voted in a Democratic runoff primary election and the precint election officials had no knowledge that such non-registered Democrats were voting.

This Court takes judicial notice of the fact that the State Election Board has complied with the Order of this Court issued on September 29, 1972.

Original Jurisdiction assumed; Writ of Mandamus granted as herein explained.

All the Justices concur.

JACKSON, Justice (concurring specially).

In our system of government elections are called and conducted so the people themselves can determine who will be selected for holding public office. Our Constitution declares that all political power is inherent in the people, Art. 2, § 1, Okla. Const. Art. 2, § 3, Okla.Const., provides that no power, civil or military, shall ever interfere to prevent the exercise of the right of suffrage by those entitled to such right.

In the instant case neither civil nor military authorities have interfered with the right of suffrage, but 104 unauthorized voters have. That is, a majority of the qualified Democrat voters of the district had the right to determine who they would have for their nominee, but the 104 unauthorized voters have made it difficult, if not impossible, to determine where the majority lies. This results from the secret ballot required by statute. This poses the question "How do we find out who received a majority of the votes of the qualified voters?" The answer can not be found in the ballot box, in voting machines, nor in recounts. The answer lies only with the unauthorized voters. If they are called as witnesses to testify for whom they voted they expose themselves to the penalties provided by 26 O.S.1971, § 475.

Since these unauthorized voters could remain silent and not give evidence against themselves, 5th U.S. Amendment, there is no satisfactory way to determine who won the nomination. In such circumstances it would be illogical to impose an impossible burden of proof on either of the candidates or those who supported them. Fortunately there is time to call a special election so that the qualified electors may select their nominee. I concur in the issuance of the order.